# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JARED MARSH, an individual, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| vs. | ) | **Case No.  14-CV-108-TCK-FHM** |
| | ) | |
| TERRA INTERNATIONAL (OKLAHOMA), INC., | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Before the Court is Defendant Terra International (Oklahoma), Inc.'s ("Terra") Motion for Summary Judgment (Doc. 39).  For reasons set forth below, such motion is granted.

## I.     Background

The following facts are either undisputed or construed in a light most favorable to Plaintiff. Plaintiff Jared Marsh ("Marsh") is a 34-year old male who served in the U.S. Army on active duty for two years and eleven months.  On or around May 10, 2007, Marsh was honorably discharged due to disability and received approximately $12,000 severance pay.  He received a Certificate of Release or Discharge From Active Duty ("Certificate of Discharge"), which lists his disability rating as 0%.[1]

### A.     Knee Injury

In early 2007, prior to his discharge, Marsh underwent arthroscopic surgery on his right knee at a veterans' hospital.  He continues to do physical therapy at home every morning and wears a knee brace two to three times a week as needed for pain and stability.  Marsh testified that his knee is "unstable," that it "buckles and gives out at times," and that he has fallen while carrying his

---

[1]  This rating "represent[s] . . . the average impairment in earning capacity resulting from . . . injuries and their residual conditions in civil occupations."  38 C.F.R. § 4.1; *see also Thorn v. BAE Sys. Haw. Shipyards, Inc.*, 586 F. Supp. 2d 1213, 1221-22 (D. Haw. 2008) (discussing 38 C.F.R. § 4.1 in relation to a disability discrimination claim).

daughter due to his knee buckling.  (Marsh Dep. 47:6-10, Ex. 2 to Resp. to Mot. for Summ. J.)  He further stated:

> I have to be a constant on edge . . . paying attention to how it's acting and feeling so I can maybe try to catch it before it's going to buckle or give out, but I try to observe and pay attention to it a lot.  There's a lot of things I have to take slow but can still do, like the morning chores and that type of stuff.

(*Id.* 49:8-14.)  Marsh does not take any medication for his knee injury.  Marsh admitted that, despite his knee injury, he "still [does] pretty much everything, just sometimes at a slower pace."  (*Id.* 51:18-21.)

## B.    Back Injury[2]

While being treated at the veterans' hospital, the doctors also informed Marsh that he had a compression fracture in his back that has caused disc degeneration.  Marsh has never had surgery on his back, treated his back injury with medication, or worn a brace.  In relation to his back injury, Marsh testified that he has to "watch how [he] pick[s] things up or hold the kids" and that if he "holds them for very long [he has] to put them down because it starts locking up."  (*Id.* 47:11-14.)

## C.    Statements to VA[3]

In March 2010, Marsh called the Department of Veterans Affairs ("VA").  Progress notes from the call indicate that Marsh's job was exacerbating his knee condition and that he went to the emergency room the previous day because his knee buckled.  (Def.'s Mot. for Summ. J., Ex. 6.5.)  On June 28, 2010, Marsh again called the VA and reported that "jobs are not working out due to his

---

[2]  Marsh's back injury was never the focus of Marsh's complaints to Terra or Terra's investigation.  Nonetheless, this injury is raised in Marsh's Petition, briefly discussed in the parties' briefs, and shall be addressed by the Court.

[3]  Neither party has raised any evidentiary objection to consideration of these statements.  Therefore, the Court assumes that information contained in these statements is either admissible or would be available in admissible form at trial.

knee giving out on him." (*Id.*, Ex. 6.8.) In July 2010, Marsh wrote a letter to the VA stating that he disagreed with his disability rating of 0% and that he was having "increased difficulty holding a job for both physical reasons (my knee) & mental (PTSD/TBI)." (*Id.*, Ex. 6.9.) In November 2011, one month before he applied for employment with Terra, Marsh visited a veterans's center and spoke with a vocational rehabilitation counselor who reported to the VA that Marsh "continuously looses [sic] jobs . . . because he falls frequently due to a knee disability." (*Id.*, Ex. 6.10.)

### D. Employment with Terra

In December 2011, Marsh applied for employment with Terra at its facility in Verdigris, Oklahoma, which manufactures and distributes ammonia products for industrial and agricultural use. Marsh interviewed with Tink Crenshaw ("Crenshaw"), a human resources manager. He filled out a medical history and provided his Certificate of Discharge to Crenshaw. The medical history completed by Marsh did not disclose the knee injury, knee surgery, or back injury, despite the form asking for hospitalizations, surgeries, or other significant injuries. Terra hired Marsh on December 27, 2011 as a shipping technician at a starting salary of $18.18/hour. After undergoing a pre-employment physical, Marsh was declared able to perform his job duties without any restrictions or limitations.

Terra's Verdigris facility operates seven days a week and twenty-four hours a day, with four different twelve-hour shifts. Shipping technicians work four shifts and then have four days off, alternating day and night shifts. Shipping technicians load hazardous liquids into railcars, trucks, and barges to fulfill customer orders, typically working in teams of four people consisting of three regular employees and one new-hire trainee. A shipping technician follows these general steps when loading product into a railcar: (1) "spot" the railcar by hooking the railcar to a switch engine and positioning it for loading; (2) disconnect the switch engine and move it a safe distance away; (3)

inspect the railcar, including removing the belly cap located underneath the railcar; and (4) climb stairs to the top of the loading rack and hook up the piping used to load the railcar. Shipping technicians climb stairs to a height of twenty feet when loading railcars and fifteen feet when loading trucks.

Shipping technicians run "loading pumps" to get product into the pipeline that is attached to the railcar, truck, or barge. A "board operator" communicates with shipping technicians to tell them whether to run one loading pump or two loading pumps at any given time. Running two loading pumps increases productivity but requires the crew to move more quickly to prevent overheating of the pumps. It is not predictable whether railcars, trucks, or barges will need loaded during any given shift or how many of each will need loaded.

Marsh worked the "2A shift" throughout his employment. He was supervised by Tony Cloud ("Cloud") from his start date until December 2012, when Cloud retired. Beginning December 2012, Marsh was supervised by Mark Dees ("Dees"). During relevant times, Bill Brown ("Brown") was the Production Manager at the Verdigris facility. Prior to Dees taking over supervision of Marsh, Marsh had informed Cloud of his bad knee.

At the end of Marsh's ninety-day probationary period, Cloud rated him as "good" in all areas, stated that Marsh "works very hard and is willing to learn," and recommended him for permanent employment. (Resp. to Mot. for Summ. J., Ex. 8.) On December 21, 2012, after being employed one year, Brown sent an email to Crenshaw approving a salary increase from Level 1 to Level 2 and stating that Marsh met all qualifications and performance expectations. (*Id.*, Ex. 10.) On January 25, 2013, Dees completed a performance appraisal and concluded that Marsh met expectations in all areas.

### E.     Termination by Terra

At some point after Dees took Cloud's position, Dees concluded that the 2A shift was less productive than other shifts because it was not running two loading pumps as frequently as other shifts. In March 2013, Dees instructed the lead technician for the 2A shift to run two pumps when possible, to communicate to the board operator when they only needed one pump, and to enter into the logbook when they had only one pump running instead of two. Approximately ten minutes after Dees gave this direction, Marsh came into Dees' office and asked if Cloud had informed Dees that Marsh was a disabled veteran. Marsh expressed his concerns about his ability to run two pumps due to his bad knee. Marsh worked for the next three days operating two pumps but had trouble keeping up, and the board operator had to repeatedly stop the pumps and reset them due to overheating. Marsh stated in his deposition that he "was just not moving fast enough." (Marsh Dep. 61:6-8, Ex. 1 to Mot. for Summ. J.)

On Thursday, April 4, 2013, Dees and Gary Collins ("Collins"), the facility's Production Manager, met with Marsh and questioned him about his knee injury. The following day, Marsh provided Collins another copy of his Certificate of Discharge. According to a summary email sent by Collins to Crenshaw and Brown on April 5, 2013, Marsh told Collins that he "was considered 70% disabled by the military due to knee and back injuries and that this impaired his ability to perform duties of the Shipping Technician equal to the other Technicians." (Def.'s Mot. for Summ J., Ex. 4-14.) Collins and Dees placed Marsh on paid leave while they reviewed the situation. In this email, Collins recommended Marsh's termination due to Marsh's "lack of disclosure of his physical disability, and the significant risk of injury to [Marsh] by continuing these duties." (*Id.*)

Collins' email was forwarded to Wendy Jablow Spertus ("Spertus"), Terra's Senior Vice President of Human Resources, who conducted a conference call with Collins, Crenshaw, and Brown. Instead of terminating Marsh at that time, they decided to send Marsh to an Independent Medical Examiner ("IME") to determine whether he in fact had a "disability" for purposes of compliance with disability laws.

Marsh saw the IME, Dr. Mitchell Martineau ("Martineau"), on April 10, 2013. Martineau's notes from the visit provide:

> [E]xam requested by employer to assess reported previous knee and low back injuries while in the military. Currently works on loading dock area where there is a concern about re-injury. Per patient, has worked in area for 15 mos. without incident. Denies current pain or issues. Copy of job description has been provided. Reported he was medically discharged from the Army in 2007 for knee and low back problems and was subsequently given a VA rating and disability. Was involved in multiple IED explosions in Iraq with some concussions as well. Had arthroscopic surgery on right knee upon return but no surgery to back.
> . . . .
> Musculoskeletal:
> Lower back pain: occasional episodes lasting no more than 1 d with intermittant [sic] left leg pain. Approximately 1-2 episodes per year. Has not missed work due to back pain. Unknown specific injury but pain began during military training around 2005. Reportedly diagnosed with compression [fracture] from L4 to T1. No surgery.
> Trauma to knee(s): affecting the right knee. Twisting injury during training with the military in 2005. Reported PCL/MCL injury and torn meniscus. Subsequent arthoscopic surgery with meniscal repair in 2007 after attempted to rehab unsuccessfully with physical therapy.
> . . . .
> Addendum:
> [4/11/13] After lengthy discussion with CareATC administration and Dr. Hutton, medical director, it was felt that this patients [sic] further evaluation would be better suited for Occupational Health, since he does not have a current complaint. Will discuss with [Terra] administration and suspend further testing.
> [4/17/13] Pt was actually sent to Servant for MRI of knee and lumbar. MRI complete and being reviewed by Mitch.

(Resp. to Mot. for Summ. J., Ex. 11.)

Marsh went to a follow-up appointment with Martineau on April 26, 2013. Martineau made three "assessments" and suggested corresponding treatments:

> [H]ere for a review of obtained VA medical records, MRI's of right knee/lumbar spine, and Xray's of lumbar spine. Denies current complaint.
> . . . .
> Treatment
> 1. Degeneration of intervertebral disc, site unspecified
> Some minor degeneration of lumbar spine should not preclude patient from performing outlined job tasks. Advised patient to work on core strengthening and demonstrated proper exercised to maintain strength. . . . .
> 2. Closed fracture of dorsal (thoracic) vertebra without mention of spinal cord injury
> Mild compression fractures at T11 and T12. Both are chronic and have healed. Should not preclude patient from performing outlines job tasks. . . . .
> 3. General osteoarthritis, unspecified site
> Some knee arthritic changes and effusion with mild patellar tracking problem. No current meniscal or ligamentous injury. Should not preclude patient from performing outlined job tasks. . . . .

(*Id.*) The list of "outlined job tasks" provided to Martineau by Terra did not list "running two pumps" or any other explanation of the newly imposed "two-pump" requirement for shipping technicians. Nor does any other job description for the shipping technician position. Marsh did not get a second medical opinion.

On May 21, 2013, Marsh attended a meeting with Dees, Collins, and Crenshaw. Terra's transcription of this meeting, which Marsh attached as evidence to his response brief and apparently does not dispute, provides:

> Gary [Collins]: Mark review how this all began.
> Mark [Dees]: Due to loading numbers on #2A shift being lower than other shifts, I met with the Shipping Technicians to let them know that we were starting two pumps running. After the meeting, Jared came to me with his concerns about keeping up. He indicated that he had a knee and back disability, which I thought he indicated was 60%. I informed Jimmy Lewis because I had concerns and wasn't aware of his disability.
> Gary: I was notified by Jimmy Lewis that you had informed Mark that you couldn't perform the job at the required pace because you had a 70% disability from the military due to injuries to your knee and back. I asked you to meet with me and discuss this issue - during this meeting, you told me the same thing.

We sent you to our on-site Wellness Center for testing and evaluation to determine if you could safely perform the expectations of the job without becoming injured or re-injuring your knee or back. What do you think about the job and your ability to perform the job relative to your stated disabilities.

Jared [Marsh]: I've been doing the job for over a year.

Mark: Since our loading numbers were lower than the other shifts, I wanted to get our numbers up equivalent with the other shifts.

Jared: *I can't be pushed that hard.*

Gary: You have been doing the job for over a year, so what was different about the day that you voiced your concerns about your disability with Mark?

Jared: *With the direction about running two pumps, I wanted to give Mark a heads up and communicate my concerns ahead of time before something happened.*

Gary: OK, so what do we need to do different to enable you to perform your job equivalent to our expectations?

Mark: You have to perform at a steady pace and perform your job safe.

Gary: We can't take a chance of you getting hurt, I absolutely can not have you injure yourself or re-injure a previous injury. What do I need to do to insure that this does not occur?

Jared: *I don't know. When my knee hurts, I put on my knee brace. When running two pumps, I can't keep up.*

Gary: Going forward, is the solution that we just run one pump?

Mark: No, we have to get our loading numbers up due to production and to match other shifts. In the past there have been problems between A and C shifts because C shift feels that A shift is not loading as much as they are.

Gary: Jared, do we need to go to one pump for you?

Jared: Yes. I tried to communicate before the fact. I turned my 214 discharge form in to Tink.

Gary: There is no record of that. You also didn't identify any of your disabilities, previous injuries, or surgeries on the pre-employment physical forms.

Jared: I brought the 214 military discharge form to my interview and turned it in with the application.

Gary: We don't have record of that.[4]

Jared: I did bring in another one when you requested it after our meeting. I want to continue to work here.

Tink: On our application, the question is asked about if you are able to perform the duties of the job. You answered it yes.

Jared: I hadn't had any problems with the job. I thought I could do the job. *Mark changed the expectations and I didn't know if I could perform.*

Mark: Sometimes we can have an extra person - two working on trucks and two working on rail cars. There is still a lot of up and down climbing on the switch engine.

---

[4] For purposes of summary judgment, the Court assumes Marsh provided Terra with the Certificate of Discharge during his interview.

Gary:  Let us review the doctor's report, what accommodations we can make for you, etc., and we'll get back in touch with you.  I want you to continue to get paid, regardless, and you won't lose any pay.  You have been receiving your check, right?

Jared:  Yes.  I want to come back to work.  *Can we use two pumps and shut down one if I need to?*

Gary:  Let us review this situation.  We certainly do not want to injury you.  You notified us that you have a disability, and I need to make sure we follow-up appropriately with this.

Mark:  When the time comes for moving up into the plant, it depends on what plant he would be assigned to, but there is a lot of climbing, etc.

Gary:  Jared, We'll be in touch, thank you for coming in.

(Resp. to Mot. for Summ. J., Ex. 7 (emphases and footnote added).)

After being made aware of what occurred at the meeting and Martineau's medical conclusions, Spertus made the decision to terminate Marsh's employment for the following reasons:

> Several things.  I had an independent medical examination indicating that Mr. Marsh was physically capable of doing the job.  I had Mr. Marsh saying that he was nervous and he didn't think he could perform the job without – that he could perform the job safely, that he felt he would be hurt, even after he got the results back from the medical examiner.  I had pre-employment documentation with no indication of any prior injury but an employee stating that he had prior injuries that wasn't recorded on the pre-employment documentation, and based on the fact that the independent medical examiner said he could do the job, which Mr. Marsh never refuted, he never refuted the validity of the independent medical examiner determination.  He never asked to get another opinion and didn't refute what the medical examiner said but still says he was nervous about doing the job and he didn't think he could do it.  It's my opinion that he wasn't capable of doing the job and that he wasn't able to perform the job as he was physically capable of doing, and I can't have someone in there that thinks they're going to be hurt or if they're not willing to do the job.

(Spertus Dep. 63:22-64:24, Ex. 4 to Mot. for Summ. J.)  Marsh received a termination letter on June 10, 2013, summarizing Spertus' decision and concluding that Terra was "left with no alternative but to terminate [his] employment" because the "interactive process has resulted in [his] continued refusal to perform an essential function of the Shipping Technician position which medical opinion states you are medically able to perform."  (Resp. to Mot. for Summ. J., Ex. 15.)

A summary document placed in Marsh's personnel file following his termination provides: "The results [of the IME] indicated nothing to preclude him from performing the outlined job tasks. He indicated a requested accommodation of allowing him to only run one loading pump. This was not a reasonable accommodation . . . . He was terminated for unacceptable performance . . . ." (*Id.*, Ex. 14.)

## F.    VA Disability Application

On July 7, 2014, after Marsh had worked for two other employers following Terra, Marsh applied for "Increased Compensation Based on Unemployability" with the VA ("Disability Application"). The form states that Marsh's back injury is the service-connected disability preventing him from gaining employment. In the "remarks" section, the form states that Marsh was told he would "only stay employed (as temporary status) if [he] agreed to perform additional physically demanding labor, which I could not perform due to pain." (Mot. for Summ. J., Ex. 6.11.) Because Marsh was employed by another entity at the time of the Disability Application, it is not clear whether Marsh was referring to his employment with Terra or his then-current employer.

On August 13, 2014, Marsh's attorney sent a letter to the VA providing notice of disagreement with a June 9, 2014 rating decision and again stating that Marsh was entitled to compensation based on unemployability. However, this letter mentions a bowel condition and does not mention Marsh's knee or back injury. The June 2014 "rating decision" mentioned in this letter is not part of the record, and there is no testimony regarding what, if any, action the VA has taken in relation to Marsh's Disability Application.

## G.    Complaint

Marsh filed his Complaint on February 10, 2014, asserting three claims: (1) that Terra discriminated against him based on disability; (2) that Terra failed to make a reasonable

accommodation for his disability; and (3) that members of Terra's management intentionally inflicted emotional distress upon him.  Terra moved for summary judgment on all claims.  In his response brief, Marsh abandoned his intentional infliction of emotional distress ("IIED") claim.

## II.      Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of showing that no genuine issue of material fact exists.  *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006).  The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party.  *Id.*  However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in his complaint but must "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The party seeking to overcome a motion for summary judgment must also make a showing sufficient  to establish the existence of those elements essential to that party's case.  *See Celotex Corp. v.  Catrett*, 477 U.S. 317, 323-33 (1986).

## III.     ADAAA

Congress passed the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA") with the explicit purpose of broadening the protections of the Americans with Disabilities Act of 1990 ("ADA") and rejecting certain Supreme Court law interpreting the ADA's definition of disability.  *See* Pub. L. No. 110–325, 122 Stat. 3553; *Smothers v. Solvay Chem., Inc.,* 740 F.3d 530, 545 n.16 (10th Cir. 2014) ("The Amendments Act created a broader definition of disability to protect more individuals, by, inter alia, expanding what is considered a major life activity and directing courts to interpret 'substantial limitation' broadly in favor of coverage."); *Carter v. Pathfinder Energy Svcs., Inc.*, 662 F.3d 1134, 1144 (10th Cir. 2011) ("Congress amended the ADA in 2008 to

correct what it viewed as an overly restrictive interpretation of the statute's terms that had been adopted by the Supreme Court in [*Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999) and *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002)].") (internal quotation marks omitted); *Allen v. Southcrest Hosp.*, 455 F. App'x 827, 834 (10th Cir. 2011) (discussing the "more favorable definition of disability as clarified by the [ADAAA] and applied in the new regulations promulgated under the ADAAA"). Because all relevant events occurred after the ADAAA took effect on January 1, 2009, the amendments apply in this case. *Carter*, 662 F.3d at 1144 (explaining that ADAAA applies prospectively only).

Inexplicably, Marsh's counsel did not rely upon the ADAAA or the new regulations promulgated thereunder. (*See, e.g.*, Resp. to Mot. for Summ. J. 18-22 (citing pre-amendment standards).) Marsh's counsel are experienced federal discrimination lawyers, and their failure to recognize that Congress amended a statutory scheme in a manner that favors their client is disappointing. In most of their briefing, both parties cited and relied upon pre-amendment case law. The Court has afforded such case law only that weight deemed appropriate in light of the changes effected by the ADAAA.

## IV.    Disability Discrimination Claim

A prima facie case of disability discrimination requires Marsh to show: (1) he was a disabled person; (2) he was qualified, with or without reasonable accommodation, to perform the essential functions of his job; and (3) he was fired because of his disability. *Carter*, 662 F.3d at 1142. If Marsh makes such a showing, the burden shifts to Terra to articulate some legitimate, nondiscriminatory reason for its actions. *Id.* at 1141. Marsh then bears the ultimate burden of showing that Terra's proffered reason is a pretext designed to mask discrimination. *Id.*

### A.     Prima Facie Case - Back Injury - Causation

With respect to Marsh's alleged disability due to back injury, he has produced no evidence to support the third element.  Marsh himself never mentioned or raised any back injury to Terra.  None of Marsh's evidence indicates that Terra officials discussed or considered the back injury in any manner when they decided to terminate him.  Instead, Terra's internal records and all testimony by Terra decisionmakers centers on Marsh's knee injury.   Although the back injury is mentioned in Marsh's medical records and Terra was aware of such injury, there is no evidence indicating that it played any role in the termination decision.  The course of events leading to Marsh's termination originated with a complaint about his knee, and all evidence indicates that Marsh's discrimination claim is premised solely upon the knee injury.  Accordingly, Marsh cannot satisfy even the light causation burden imposed at the prima facie stage.

### B.     Prima Facie Case - Knee Injury

#### 1.     Causation

In contrast to the back injury, Marsh has presented evidence that (1) he raised specific concerns regarding his knee injury as an alleged disability, (2) the knee injury was discussed, contemplated, and considered by Terra officials at meetings prior to his termination, and (3) Terra officials determined that he was unable to safely run two pumps based on concerns expressed by Marsh.  This is sufficient to satisfy the third element of the prima facie case.  *See Carter*, 662 F.3d at 1147 (employer's statements that an employee's alleged disability prevented him from working 24-hour shifts was sufficient to satisfy prima facie case because they could lead a jury to conclude that plaintiff "was fired because he needed more rest than others between jobs").  The Court now turns to the other two elements of a prima facie case for disability discrimination.

## 2. Disability

The term "disability" means, with respect to an individual--

(A) a physical . . . impairment that substantially limits one or more major life activities of such individual;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment (as described in paragraph (3)).

42 U.S.C. § 12102(1)(A)-(C). Regardless of which type of "disability" is at issue, the term must be "construed in favor of broad coverage of individuals . . . to the maximum extent permitted by the terms of this chapter." *Id.* § 12102(4)(A). In this case, Marsh asserts that he qualifies under all three types of disability.

### a. Section 12102(1)(A) - Actual Disability

In order to show an actual disability under § 12102(1)(A), Marsh must "(1) have a recognized impairment, (2) identify one or more appropriate major life activities, and (3) show the impairment substantially limits one or more of those activities." *Felkins v. City of Lakewood*, 774 F.3d 647, 650 (10th Cir. 2014). The first two requirements are questions of law, while the third is a question of fact. *Sanchez v. Vilsack*, 695 F.3d 1174, 1179 (10th Cir. 2012).

### i. Recognized Impairment

Records indicate that Marsh suffered a twisting injury to his right knee during his military training in 2005. Marsh underwent surgery in 2007 after physical therapy was unsuccessful. Martineau described the current condition of Marsh's knee as general osteoarthritis, with "knee arthritic changes and effusion with mild patellar tracking problem." Marsh does physical therapy for his knee every day and wears a knee brace as needed for pain. The Court concludes that the knee injury qualifies as a recognized physical impairment affecting his musculoskeletal system. *See* 29 C.F.R. § 1630.2(h)(1) (defining physical impairment as "[a]ny physiological disorder or condition . . . affecting one or more body systems, such as . . . musculoskeletal . . . .").

### ii.     Major Life Activity

Next, Marsh must identify the major life activity or activities impacted by this physical impairment.  He argues that his knee problem impacts his ability to "play sports, ride horses, and even hold his own children."  (Resp. to Mot. for Summ. J. 19.)  Marsh described one instance where he was carrying his daughter and fell because his knee buckled.  Marsh contends that he must pay attention to how his knee feels and catch it before it buckles.  Construed in its most favorable light, Marsh's testimony identifies three life activities impacted by his knee injury: (1) playing sports, (2) riding horses, and (3) carrying.

### a.     Playing Sports/Riding Horses

The regulations list the following examples of major life activities:

> Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working[.]

29 C.F.R. § 1630.2(i)(1)(i).  The regulations, implementing the ADAAA, further explain that "[i]n determining other examples of major life activities, the term 'major' shall not be interpreted strictly to create a demanding standard for disability" and that "[w]hether an activity is a 'major life activity' is not determined by reference to whether it is of 'central importance to daily life.'"  *Id.* § 1630.2(i)(2).  By removing the "central importance to daily life," the new regulations make a drastic change in the "major life activity" component of the disability analysis.[5]

Prior to passage of the ADAAA, courts consistently held that sporting activities, including riding horses, did not qualify as major life activities.  *See Griego v. Barton Leasing Co.*, No. 08-cv-

---

[5]  The "central importance to daily life" standard was adopted by the Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 198 (2002), which was superseded by the ADAAA.

2325, 2010 WL 618281, at *4 (D. Colo. Feb. 19, 2010) (holding that "participating in sports" and "playing sports with children" were not major life activities); *Robinson v. Lockheed Martin Co.,* No. 04-3143, 2006 WL 5629118, at *7 (E.D. Pa. Feb. 1, 2006) (holding that sporting activities, including horseback riding, were not major life activities); *Stanley v. White Swan, Inc.*, No. CIV000-1291, 2002 WL 32061753, at *5 (W.D. Okla. Sept. 26, 2002) (holding that horseback riding, saddling and controlling a horse, caring for horses, and maintaining a farm are not major life activities); *Rosa v. Brink's Inc.*, 103 F. Supp. 2d 287, 290 (S.D.N.Y. 2000) (holding that sports activities, including riding horses, "are not major life activities at all"). These cases, however, are no longer necessarily controlling.

Under current law, the Court continues to find that sporting activities, including riding horses, do not constitute major life activities. The main change from prior law is that an activity need not be of "cental importance to daily life" in order to be a "major" life activity. Nonetheless, the word "major" is still in the statute, indicating that not every activity in which a plaintiff wishes to participate will qualify. Not only are playing sports and riding horses not central to daily life, they are not highly relevant to daily life. Unlike standing, sitting, breathing, thinking, communicating, interacting with others, or other examples in the regulation, a person can live (and many do) without ever participating in sports or riding horses. These activities may enhance one's life and may be important to particular individuals, but the ADA is ultimately aimed at fereting out discrimination and ensuring that employers provide reasonable accommodations to disabled individuals. Requiring employers to consider a person "disabled" under the ADA simply because a physical impairment limits their ability to play sports or ride horses seems far afield from these overarching purposes, even considering the intent of the 2008 amendments.

Further, the Court has concerns about ruling, as a matter of law, that sporting activities are major life activities. If participating in sports constitutes a major life activity, a plaintiff will almost always be able to show a substantial or material impact on his ability to perform. For example, the Court can imagine numerous scenarios in which a plaintiff (1) has a physical impairment, such as an arthritic knee, that (2) substantially limits his ability to snow ski, run marathons, or play pick-up basketball. Again, such an impairment being deemed a disability seems far afield of the overarching purpose of the ADA.[6] In this case, Plaintiff suffered a knee injury that prevents him from playing sports he once enjoyed and from riding horses as often as he would like. Although these are some of his life activities or desired life activities, they do not qualify as "major" life activities even under the broadened definition in the regulations.

### b.    Carrying

Prior to passage of the ADAAA, courts uniformly held that "carrying" qualified as a major life activity. *See Amador v. Macy's East-Herald Square*, No, 12-CV-4884, 2014 WL 5059799, at *15 (S.D.N.Y. Oct. 3, 2014) (holding that "there can be no dispute that carrying is a 'major life activity'" because "[t]he performance of 'manual tasks' is explicitly included in the EEOC regulation and it is a task of central importance to daily life"); *Hall v. Cablevision of Conn., L.P.*, No. 3:09-CV-1347, 2011 WL 4829775, at *4 (D. Conn. Oct. 11, 2011) (describing "lifting" as a major life activity); *Demetropoulos v. Derynda Foods, Inc.*, No. 08-C-0420, 2010 WL 2900342, at *7 (E.D. Wisc. July 20, 2010) (analyzing whether back, neck and shoulder injury substantially limited the "major life activities of 'lifting,' and, by extension, carrying"). Thus, under the

_____

[6] This is particularly true if the person developed the impairment while engaging in the sporting activity and then claimed "disability" because the impairment limited his ability to participate in such activity.

broadened definition in the current regulations, the Court finds that "carrying" qualifies as a major life activity.

### iii.     Substantially Limits

The next question is whether Marsh has created a genuine question of fact for a jury as to whether his knee injury "substantially limits" his ability to carry, *see* 42 U.S.C. § 12102(1)(A), as compared to most people in the general population*, see* 29 C.F.R. § 1630.2(j)(1)(ii) (explaining that proper comparator is the "general population").   Although the "substantially limits" language remains in the statute following passage of the ADAAA, the implementing regulations now state that the impairment "need not prevent, *or significantly or severely* restrict, the individual from performing a major life activity in order to be considered substantially limiting."   29 C.F.R. § 1630.2(j)(1)(ii) (emphasis added).   Further watering down the "substantially limits" statutory language, the regulations explain that this phrase: (1) is to be construed broadly in favor of expansive coverage, 29 C.F.R. § 1630.2(j)(1)(i); (2) "is not meant to be a demanding standard;" *id.;* (3) is a threshold issue that "should not demand extensive analysis," *id.* § 1630.2(j)(1)(iii); (4) requires a lower "degree of functional limitation" than under the pre-amendment version of the ADA, *id.* § 1630.2(j)(1)(iv); and (5) does not require scientific, medical, or statistical analysis, *id.* § 1630.2(j)(1)(v).

There is tension between the "substantially limits" statutory language and the interpretive regulations adopted by the EEOC following passage of the ADAAA, which implement Congress' intent to lessen the "substantially limits" burden.   Attempting to reconcile the statute and interpretive guidance, the Court concludes that "substantially" must be given some meaning, *i.e.*, not just any "limitation" on a person's abilities will suffice.   However, "substantially" means something less than significantly or severely and is not meant to be a demanding standard.   With these principles in

mind, the Court interprets "substantially limits" as something akin to "materially restricts." *See* Cmt., Andrew E. Henry, *The ADA Amendments Act of 2008: Why the Qualified Individual Analysis is the New Battleground for Employment Discrimination Suits*, 67 Okla. L. Rev. 111, 137-38 (2014) (urging EEOC to adopt "materially restricts" language and explaining that ADAAA's legislative history supports this standard). This gives meaning to the statutory language without running afoul of Congress' intent in passing the ADAAA or the EEOC's interpretive guidance.[7]

Applying this standard, Marsh has created a genuine question of fact as to whether his knee injury substantially or materially limits his ability to carry, in comparison with most people in the general population. Marsh reported to the VA, immediately prior to his employment with Terra, that his knee was repeatedly buckling and preventing him from staying employed. In July 2010, Marsh visited the emergency room after his knee buckled on him. Marsh testified in his deposition that he has to be cautious of his knee and is constantly on guard to prevent his knee from buckling, particularly while carrying his children. The Court finds this evidence sufficient to survive summary judgment on the "substantially limits" element, as this phrase is defined in the ADAAA's implementing regulations.[8]

---

[7] A jury would have a difficult time understanding an instruction premised upon the statute and regulations in conjunction. But using only the statutory language would seem to ignore Congress' intent in passing the ADAAA. Until the Tenth Circuit provides guidance, the Court finds that "materially restricts" is a reasonable reconciliation of the two.

[8] Prior to the amendments, Marsh's impairment may have fallen short of being a substantial limitation on his ability to carry. No doctor ever placed Marsh on any restrictions as to lifting or carrying. Marsh's knee was recently examined by Martineau, who ordered and viewed an MRI and declined to place Marsh on any lifting or carrying restrictions. Marsh admitted that he can perform all activities he used to perform but that he just has to do so more slowly and more cautiously. Further, although Marsh has challenged this rating, Marsh's VA disability rating is 0%. *See Villanti v. Cold Spring Harbor Cent. Sch. Dist.*, 733 F. Supp. 2d 371, 381 (E.D.N.Y. 2010) (applying pre-amendment version of ADA) (plaintiff's description of her limitations on major life activities of lifting and carrying deemed not "substantially limiting" because she was able to sometimes carry her son or light objects). This makes Marsh's

Marsh has established a prima facie case that his knee injury is an actual disability under § 12102(1)(A).

### b.    Section 12102(1)(B) - Record of Disability

Marsh also argues that he qualifies as disabled because he has a record of disability under § 12102(1)(B). "An individual has a record of a disability if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k). Marsh cannot point to any record of disability, history of disability, or misclassification as disabled. First, the Certificate of Discharge does not qualify because a VA disability rating is not synonymous with being "disabled" under the ADA. *See Thorn*, 586 F. Supp. 2d at 1222 ("A VA disability rating – based on quantifying a decrease in a veteran's earning capacity – is a completely different inquiry and standard than that imposed by the ADA . . . ."). In fact, courts have found no disability or record of disability under the ADA, even when a plaintiff's VA rating well exceeded 0%. *See, e.g., DiCarlo v.* Potter, 358 F.3d 408, 418-19 (6th Cir. 2004) (20%); *Thorn*, 586 F. Supp. 2d at 1222 (40%); *Spencer v. U.S. Postal Serv.*, No. 08-CV-2249, 2009 WL 5217981, at *6-7 (D. Colo. Dec. 29, 2009) (20%); Evans v. Potter, No. 02-4043, 2003 WL 24085317, at *7 (D. Md. Sept. 9, 2003) (30%). In this case, the fact that the Certificate of Discharge indicates a 0% rating weighs against any finding that it constitutes a record of disability. Further, the form did not cause Terra to mistakenly believe Marsh was disabled. Spertus testified that she did not know what the form meant, since it appeared to classify Marsh as a disabled veteran but then gave him a 0% disability rating. Rather than create a mistaken impression of disability, this record caused Terra to send Marsh for evaluation by an IME.

---

counsel's failure to cite the new regulations particularly egregious. (*See* Resp. to Mot. for Summ. J. 19.)

The only other relevant records of impairment are Martineau's medical records, but these also do not indicate that Marsh has a physical impairment that materially restricts one or more of his major life activities. Martineau's records establish that Marsh has two relevant physical impairments – the back and knee injuries. However, the records also indicate that these impairments did not cause Marsh any significant problems and did not cause Martineau to place Marsh on any restrictions. Marsh was seeing Martineau at the behest of Terra rather than due to any specific problems or flare-ups associated with either injury, and Marsh told Martineau during both visits that he was not having symptoms from either injury. Ultimately, Martineu concluded, after reviewing his VA records and recent MRIs, that Marsh was fit for duty as a shipping technician. Martineau declaring Marsh "fit for duty" for one job is not conclusive or controlling as to whether the records indicate Marsh is disabled. Someone may be fit to complete a particular job description and still be "disabled," particularly after passage of the ADAAA. However, in contrast to Marsh's deposition testimony, nothing in Martineu's medical records indicate that Marsh suffers from any impairment that substantially or materially restricts any major life activity. Marsh cannot show that he has a "record" of disability for purposes of §12102(1)(B).

### c.      Section 12102(1)(C) - Regarded as Having Disability

Marsh also contends he qualifies as disabled under the "regarded as" prong. Under this prong, a person is considered "disabled" if "the individual establishes that he or she has been subjected to an action . . . because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity*." 42 U.S.C. § 12102(3)(A) (emphasis added). Unlike an "impairment" as defined in § 12102(1)(A) and (B), an "impairment" under § 12102(1)(C) need not actually limit or be perceived by the employer to limit a major life activity. *Wolfe v. Postmaster Gen.*, 488 F. App'x 465, 468 (11th Cir. 2012) ("Because of that

amendment, a plaintiff need demonstrate only that the employer regarded him as being impaired, not that the employer believed the impairment prevented the plaintiff from performing a major life activity.").  The only remaining qualification on the term "impairment," for purposes of § 12102(1)(C), is that a condition may not be deemed an impairment if it is "transitory and minor." 42 U.S.C. § 12102(3)(B). A transitory impairment is one "with an actual or expected duration of [six] months or less." *Id.*; *see, e.g., Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 260 (3rd Cir. 2014)  (alleged perceived impairment of broken finger was transitory and minor and failed to state a claim, even under the "regarded as" prong).  This removal of the "substantially limits a major life activity" from the "regarded as" claim is a change in law, and neither party cited or discussed the correct standard.[9]

Applying this standard, the Court concludes that Marsh can satisfy his prima facie case of "disability" under § 12102(1)(C) because he has demonstrated: (1) his knee injury is a physical impairment, (2) it is not transitory, and (3) Terra was aware of and had therefore "perceived" the impairment at the time of Marsh's termination.  The Court does so somewhat reluctantly.  The original intent of "regarded as" claims was to prevent discrimination based on unfounded concerns, mistaken beliefs, fears, and prejudices about disabilities.  Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R. pt. 1630 app. §1630.2(l).  By eliminating the "disability" component of the "regarded as" claim, the statute protects individuals who are regarded as having

---

[9]  Although cited by both parties (*see* Mot. for Summ. J. 20; Resp. to Mot. for Summ. J. 22), the Tenth Circuit's "regarded as" test in *Jones v. United Parcel Service, Inc.*, 502 F.3d 1176, 1190 (10th Cir. 2007), was superseded by the ADAAA.  *See Brown v. City of Jacksonville*, 711 F.3d 883, 889 (8th Cir. 2013) (acknowledging that its prior "regarded as" test was superseded by ADAAA).

any impairment, rather than those who are regarded as having the type of impairment to which stereotypes, mistaken beliefs, and prejudices normally attach.[10]

In summary, Marsh has satisfied the "disability" element of his prima facie case in two ways: (1) he has shown, under 42 U.S.C. § 12102(1)(A), that his knee injury is a physical impairment that substantially or materially impacts the major life activity of carrying; and (2) he has shown, under 42 U.S.C. § 12102(1)(C), that his knee injury is a non-transitory physical impairment about which Terra was aware at the time of his termination. All remedies remain available to Marsh based on the two types of disabilities at issue.[11]

### 3.   Qualified Individual[12]

Another element of a prima facie case of disability discrimination requires Marsh to show he was qualified, with or without reasonable accommodation, to perform the essential functions of his job.

---

[10] Commentators have opined that the ADAAA creates overly broad "regarded as" coverage and that "almost any individual with some appreciable impairment (or perceived impairment) may qualify." *See* Cmt., Andrew E. Henry, *The ADA Amendments Act of 2008: Why the Qualified Individual Analysis is the New Battleground for Employment Discrimination Suits*, 67 Okla. L. Rev. 111, 138 (2014).

[11] Courts must be precise as to which type of disability is at issue in any given case because there are differences between 42 U.S.C. § 12102(1)(C) disabilities and §§ 12102(1)(A) and (B) disabilities. As explained above, a "regarded as" claim under § 12102(1)(C) is easier to prove because the impairment need not limit or be perceived to limit a major life activity. However, it also has limited remedies. *See* 42 U.S.C. § 12201(h) (employer need not provide reasonable accommodation to individual who meets the definition of disability only under the "regarded as" prong).

[12] The ADAAA made no significant changes to the "qualified individual" analysis, and prior Tenth Circuit cases remain good law.

a.      **Estoppel**

Terra first argues that Marsh is equitably estopped from satisfying this element based on statements made to the VA in 2010, 2011, and 2014.  The estoppel argument stems from the Supreme Court's decision in *Cleveland v. Policy Management Systems Corporation,* 526 U.S. 795, 806 (1999), wherein the Court examined the interplay between the Social Security Disability Insurance ("SSDI") program, which provides benefits for those unable to engage in any kind of substantial gainful work, and the ADA:

> We believe that, in context, these two seemingly divergent statutory contentions are often consistent, each with the other. Thus pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim. Nor does the law erect a strong presumption against the recipient's success under the ADA. Nonetheless, an ADA plaintiff cannot simply ignore her SSDI contention that she was too disabled to work. To survive a defendant's motion for summary judgment, she must explain why that SSDI contention is consistent with her ADA claim that she could 'perform the essential function' of her previous job, at least with 'reasonable accommodation.'

*Id.* at 797-98, 807; *see also Mathews v. Denver Newspaper Agency*, 649 F.3d 1199, 1209 (10th Cir. 2011) (employee estopped from asserting that his disabling depression occurred only *after* being placed on leave, when he had previously sworn to the Social Security Administration ("SSA") that depression rendered him unable to work *before* being placed on leave, without giving any sufficient explanation for the discrepancy); *Hawkins v. Schwan's Home Serv.*, *Inc.*, No. CIV-12-0084, 2013 WL 2368813, at *9-10 (W.D. Okla. 2013) (employee estopped from asserting he was qualified for position when, following the alleged discriminatory actions, he represented to SSA he did not qualify for a commercial driver's license which was required for the position).

Marsh's statements to the VA in 2010 and 2011 regarding his knee injury do not estop him from asserting he is qualified for Terra's shipping technician position.  They were merely comments to a VA hotline operater rather than sworn representations made in pursuit of legal benefits.  The

letter sent by an attorney in August of 2014 also does not give rise to estoppel because it was written by Marsh's attorney, is not a sworn statement, and seems to focus entirely on health conditions other than the knee injury at issue in this case.

The Disability Application submitted by Marsh to the VA in July of 2014 requires closer examination. The Disability Application is a formal request for total disability payments based on unemployability. *See generally* 38 C.F.R. § 4.16 (explaining the VA's total disability rating based on individual unemployability). Like an application for total disability to the SSA, the Disability Application potentially "implies a context-related legal conclusion" (an inability to perform any job) that may "negate an essential element of [an] ADA claim" (qualified to perform a particular job). *See Cleveland*, 526 U.S. at 802, 806. Even if there are not any specific factual conflicts between the Disability Application and Marsh's ADAAA claim, the legal implications of the Disability Application may still have an estoppel effect.[13]

Terra has failed to demonstrate that estoppel principles entitle it to summary judgment. First, the VA does not appear to have granted any total disability benefits at this juncture, such that there would be actual "double dipping" from both the VA and the ADAAA. While the receipt of benefits is not required for estoppel to come into play, it certainly increases the equitable concerns arising from any inconsistent positions. Second, it is not clear whether the Disability Application is a "sworn assertion" of the type at issue in *Cleveland,* and there is no evidence that Marsh testified at any administrative hearing in pursuit of such benefits. Third, the copy of the Disability Application in the record is incomplete, as there appears to be a page missing. Finally, the Court has concerns about applying equitable estoppel where the assertion to the VA was made over a year after Marsh's

---

[13] There are no *factual* conflicts present between the Disability Application and Marsh's assertions in this case. Nonetheless, as explained above, *Cleveland* holds that the mere existence of the application may give rise to estoppel in some circumstances.

termination from Terra and when he was employed by another company. Applying for total disability in July 2014 does not negate or even tend to negate the possibility that Marsh was qualified for the shipping technician position with Terra in June 2013. In short, the Court is unwilling to grant summary judgment to Terra based upon estoppel, given the lack of clarity regarding the nature, assertions, and outcome of the Disability Application and given the timing of such application in relation to Terra's alleged discriminatory actions.

### b. Substantive Analysis[14]

A "qualified individual" is an individual with a disability who, with or without a reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. 42 U.S.C. § 12111(8). "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *Id.* The Tenth Circuit applies

> a two-part analysis to determine whether a person is qualified under the ADA. First, the court determines whether the individual can perform the essential functions of the job. Second, if (but only if) the court concludes that the individual is unable to perform the essential functions of the job, the court determines whether any reasonable accommodation by the employer would enable him to perform those functions.

*Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1190 (10th Cir. 2003) (citations omitted).

### i. Can Marsh Perform the Essential Functions of the Job?

Clearly, Marsh could perform the essential functions of the job as it existed prior to the increased production requirements. He did the job for over a year, received a raise, and did not

---

[14] Terra's substantive arguments regarding "essential function" and "reasonable accommodation" are set forth in the section of its brief discussing Marsh's inability to establish a prima facie case of failure to accommodate. However, such arguments apply equally to both claims.

receive any negative performance evaluations. The question is whether the increased requirements imposed by Dees in March 2013 – namely, the requirement to run two pumps whenever possible – became an "essential function" of the job that Marsh could not perform.

"The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires" but does not include "the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). As to when a quantitative or qualitative standard is an essential function, the interpretive guidance to the regulations explains:

> It is important to note that the inquiry into essential functions is not intended to second guess an employer's business judgment with regard to production standards, whether qualitative or quantitative, nor to require employers to lower such standards. If an employer requires its typists to be able to accurately type 75 words per minute, it will not be called upon to explain why an inaccurate work product, or a typing speed of 65 words per minute, would not be adequate. Similarly, if a hotel requires its service workers to thoroughly clean 16 rooms per day, it will not have to explain why it requires thorough cleaning, or why it chose a 16 room rather than a 10 room requirement. However, if an employer does require accurate 75 word per minute typing or the thorough cleaning of 16 rooms, it will have to show that it actually imposes such requirements on its employees in fact, and not simply on paper. It should also be noted that, if it is alleged that the employer intentionally selected the particular level of production to exclude individuals with disabilities, the employer may have to offer a legitimate, nondiscriminatory reason for its selection.

Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R. pt. 1630, app. § 1630.2(n).

There is no genuine dispute that Dees was responsible for setting production standards for shipping technicians. Once Dees discovered that the 2A shift was underperforming in relation to the other shifts, he investigated and further determined that the 2A shift was not running two pumps when possible like other shifts were doing. Dees desired for the 2A shift to keep up with the other teams. Dees communicated to the 2A shift lead that, as a team, they were required to run two pumps whenever possible and to record when and why the team did not run two pumps. Based on these undisputed facts, the Court concludes that Marsh was not singled out for different treatment and that

Dees simply increased the expectations of the 2A shift to bring it in line with the other shifts. The Court concludes that the increased performance expectation to run two pumps is akin to any other production standard and qualifies as an "essential function" of the position.

Marsh argues that these increased expectations cannot be an "essential function" of the job because Marsh had been successfully performing his job for over a year. However, the Tenth Circuit has held that increased standards can still be "essential functions" of a position, even though they are imposed after the allegedly disabled individual was hired. *See Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124 (10th Cir. 1995) (new production standards requiring the plaintiffs to accomplish their jobs in a shorter amount of time were essential functions) ("[T]he fact that defendant made changes to its business in order to increase profit is not an impermissible action under the ADA."). In other words, "essential functions" need not remain constant and can evolve while a disabled individual is employed. Further, the absence of "running two pumps when possible" from the shipping technician's job description is not controlling in this case, based on the overall circumstances and the type of production standard at issue.

Based on Marsh's own testimony, it is clear that Marsh could not perform the "essential function" of keeping up with two pumps when necessary. Within just ten minutes of Dees communicating the new expectations to the 2A shift leader, Marsh approached Dees and expressed his concerns about running two pumps due to his knee injury. For the next three days, Marsh tried to perform his job under the new expectations but admitted in his deposition that he could not keep up. Later, in the May 2013 meeting with Dees, Crenshaw, and Collins, Marsh again admitted that he could not keep up when his team needed to run two pumps. Under these circumstances, no jury could conclude that Marsh could have performed this essential function of the job without some accommodation.

### ii.     Was There a Reasonable Accommodation Available?

Next, the court must determine whether any reasonable accommodation by Terra would have enabled Marsh to perform this essential function.  Construing the record favorably to Marsh, he requested an accommodation of his team running only one pump and/or the accommodation of using two pumps but shutting one down when Marsh could not keep up.

The Tenth Circuit has explained that altering production standards is not a reasonable or expected accommodation:

> Plaintiffs suggest an altered or reduced production standard for them, the designation of a lighter work load, or allowing them to bid for other jobs within the company that they could perform. We agree with the district court, however, that none of these accommodations are "reasonable." Altering or reducing defendant's production standards or allowing plaintiffs to move only the lighter loads is more accommodation than is reasonable for this defendant.
>
> An employer is not required by the ADA to reallocate job duties in order to change the essential function of a job.  An accommodation that would result in other employees having to worker harder or longer hours is not required.  Slowing the production schedule or assigning plaintiffs lighter loads would fundamentally alter the nature of defendant's warehouse operation, a change not demanded by the law.

*Milton*, 53 F.3d at 1124-25.  Like the requested accommodation in *Milton*, Marsh's requested accommodation is an altered production standard that is more accommodation than is reasonable. This situation arose because Dees was concerned about unequal performance among the shifts. Terra could not accommodate Marsh without lowering its standards or requiring other employees – either Marsh's fellow shift members or members of other shifts – to work harder.  Therefore, Marsh is not an individual with a disability who, with or without a reasonable accommodation, can perform the essential functions of the shipping technician position.  Having failed to create any

genuine issue of fact as to the "qualified individual" element of a prima facie case for disability discrimination, Marsh's discrimination claim fails as a matter of law.[15]

## V.     Failure to Accommodate Claim

A prima facie case of failure to accommodate requires a plaintiff to show: (1) he was a disabled individual within the meaning of the statute; (2) the employer had notice of his disability; (3) with reasonable accommodation, he could perform the essential functions of the position; and (4) the employer refused to make such accommodations. *Spielman v. Blue Cross & Blue Shield of Kan., Inc.*, 33 F. App'x 439, 443 (10th Cir. 2002).  For the same reasons explained above, Marsh has not created any questions of fact as to whether he could perform the essential functions of the position with a reasonable accommodation.  Therefore, Marsh cannot establish the third element of his prima facie case, and Terra is entitled to judgment as a matter of law on the failure to accommodate claim.

## VI.     IIED

Marsh did not respond to Terra's motion for summary judgment on the IIED claim, and the Court therefore accepts Terra's statements of fact as true.  Based on the facts and law cited in Terra's motion, the Court independently concludes that Terra is entitled to summary judgment on Marsh's IIED claim.

---

[15]  Based on the Court's conclusion that Marsh was not a "qualified individual," the Court could have truncated or skipped its analysis of the "disability" element.  *See* Henry, 67 Okla L. Rev. at 126 (explaining that, under the ADAAA, courts are assuming a disability exists or giving cursory review to "disability" analysis and granting summary judgment more frequently under "qualified individual" analysis).  However, the Court spent considerable time deciphering the new "disability" standards and includes its analysis in order to add to a scarce body of law discussing the changes effected by the ADAAA.

**VII.     Conclusion**

Terra's Motion for Summary Judgment (Doc. 39) is GRANTED.  The Court will enter a separate judgment.

**IT IS SO ORDERED** this 9th day of July, 2015.


_____
**TERENCE C. KERN**
**UNITED STATES DISTRICT JUDGE**